UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

EARL ROSEN, IV,                     :
                                    :
        Plaintiff,                  :
                                    :
        v.                          :    Case No. 2:13-cv-277
                                    :
ANDREW PALLITO, Commissioner        :
of the Vermont Department           :
of Corrections, CORRECT             :
CARE SOLUTIONS, and CENTURION       :
OF VERMONT,                         :
                                    :
        Defendants.                 :

## OPINION AND ORDER

Plaintiff Earl Rosen claims that the defendants in this case
failed to provide him with adequate mental health and medical
care while he was incarcerated.  Rosen also alleges that
programming requirements prevented him from being granted parole,
and that his placement in disciplinary segregation violated his
rights.  The Fourth Amended Complaint includes claims under the
Americans with Disabilities Act ("ADA"), the Rehabilitation Act,
the Eighth Amendment and the Due Process Clause.

Defendants Vermont Department of Corrections ("DOC")
Commissioner Andrew Pallito, Correct Care Solutions ("CCS"), and
Centurion of Vermont, LLC ("Centurion") have each moved for
summary judgment.  Commissioner Pallito and the DOC argue for the
application of sovereign immunity and contest Rosen's claims on
the merits.  CCS and Centurion argue that Rosen's medical experts
failed to provide opinions about the relevant standard of care.

All defendants submit that Rosen's claims should be dismissed because he failed to exhaust the prison grievance process. For the reasons set forth below, defendants' motions for summary judgment are **granted.**

## Factual Background

Rosen was sentenced to prison after being convicted of, among other things, engaging in "prohibited acts" in violation of 13 V.S.A. § 2632(a)(8). He was initially charged with sexual assault on a victim less than sixteen years old, in violation of 13 V.S.A. § 3252(c), but pled to a lesser charge. He was 21 years old at the time of the offense.

When Rosen was incarcerated in 2011, he arrived with a history of mental illness. Prior diagnoses included schizophrenia, paranoid type; an impulse control disorder; antisocial traits; and schizoaffective disorder, bipolar type. Upon his incarceration he was designated as having a "serious functional impairment" ("SFI") based on his own reporting.

Rosen's claims against the DOC and Commissioner Pallito revolve around his placement in segregation after a disciplinary issue, his required participation in sex offender treatment, and related issues. The segregation claim dates back to February 2012, when Rosen was involved in a fight over a coffee cup. According to the incident report, he and another inmate appeared to be planning something just before the fight. Rosen's

accomplice then walked over to the unit officer and blocked his line of sight. Rosen approached the victim, placed him in a chokehold and began punching him in the head. Rosen disputes that he was the original aggressor.

As a result of the fight, Rosen was moved to segregation and issued a Disciplinary Report ("DR"). Rosen alleges that the outburst was a result of mental illness, and that the DOC failed to appropriately consider his mental health before placing him in segregation. The DOC contends that Rosen received a medical and mental health screening clearing him for placement.[1]

Rosen was informed of his right to a hearing, but waived that right and received 15 days in segregation. During that time, he was confined to his cell with the exception of one hour of recreation per day. According to the DOC's documentation, he also received daily visits from nursing staff and mental health staff. Rosen disputes whether he received daily recreation and whether the medical staff was sufficiently qualified.

After completing his time in disciplinary segregation, Rosen was held in administrative segregation for 22 days. The DOC submits that the conditions of administrative segregation were less severe than those of disciplinary segregation, with inmates

_____

[1] Rosen disputes this fact, although there appears to be undisputed evidence that a screening took place. Rosen notes that the signature on the paperwork is not legible, and contends there is no evidence that the screening was conducted by a physician. ECF No. 186-1 at 53.

3

receiving additional recreation, showers, games, time in the day room, books, and mail. Rosen disputes that the conditions were less severe, and reports that while in segregation he complained of auditory hallucinations, insomnia, paranoia, anxiety and racing thoughts. On March 15, 2012, he filed a Health Service Request asking mental health staff to remove him from segregation. He was seen by a mental health provider the next day, and was promptly removed from segregation.

In addition to his mental health issues, Rosen suffered a physical injury while in prison. On October 20, 2012, he injured his foot playing basketball. As set forth more fully below, prison health care providers did not authorize surgery and instead opted for a more conservative approach. Rosen claims that his treatment was below the prevailing standard of care, and brings claims against CCS and Centurion for, among other things, medical malpractice.

With regard to programming, the DOC evaluated Rosen for sex offender programming given the nature of his conviction. The Vermont Treatment Program for Sexual Abusers ("VTPSA") offers six-month, 12-month, and 21 to 24-month programs. Inmates are assigned to the appropriate program based, in part, upon their sex offense and risk assessment scores. After the initial assessment, inmates are evaluated by a mental health professional to determine the most appropriate programming.

The DOC initially identified the 12-month VTPSA program as the best fit for Rosen's needs, pending a psychosexual evaluation. Rosen, however, refused to participate or be evaluted. Beginning in May 2013, he began filing grievances contending that he should not be required to take part in sex offender treatment. His protests continued for two years, including statements to case workers and signed documentation refusing programming.

In April 2015, Dr. John Holt conducted an independent psychosexual evaluation and concluded that Rosen could benefit from sex offender treatment. In June 2015, Rosen agreed to a psychosexual evaluation by the DOC. Among other things, the DOC evaluator noted that Rosen's mental health should not interfere with his ability to participate. As a result of the evaluation, the DOC referred Rosen to the 6-month VTPSA program, which he completed in December 2015. Shortly thereafter, the DOC placed him on furlough to live with his parents in the community.

The Fourth Amended Complaint sets forth six Counts. Count I alleges cruel and unusual punishment in the form of inadequate mental health care by all defendants, including CCS and Centurion. Counts II, III, and IV have been stricken. Count V, brought solely against Commissioner Pallito and the DOC, alleges that Rosen's placement and treatment while in solitary confinement violated the Rehabilitation Act. Count VI asserts

that Rosen's medical care violated DOC policies and constituted medical malpractice. Count VII claims cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments with regard to his health care and confinement in segregation. Count VIII alleges discrimination on the basis of a disability in violation of the ADA and/or the Rehabilitation Act. Finally, Count IX alleges violations of the anti-retaliation provisions of the ADA. Counts VI through IX are brought against all defendants.

## Discussion

### I.   The Summary Judgment Standard

The standard for summary judgment is well established. The moving party is entitled to summary judgment if it demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). This showing may be made by depositions, affidavits, interrogatory answers, admissions, or other exhibits in the record. Fed. R. Civ. P. 56(c). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). If the moving party carries its

burden, "the opposing party must come forward with specific
evidence demonstrating the existence of a genuine dispute of
material fact." *Brown v. Eli Lily & Co.*, 654 F.3d 347, 358 (2d
Cir. 2011) (citation omitted).

## II.  The DOC's Motion for Summary Judgment

### A.  Sovereign Immunity and Title II of the ADA

The DOC first argues that, to the extent Rosen is seeking
money damages, his claims under Title II of the ADA are barred by
sovereign immunity.  In general, federal court claims against a
state agency or a state official being sued in his or her
official capacity are barred by the Eleventh Amendment.  *See*
*Seminole Tribe v. Florida*, 517 U.S. 44, 54 (1996).  In some
circumstances, however, Congress can pass legislation that
abrogates the States' immunity from suit.  "In order to determine
whether Congress has abrogated the States' sovereign immunity, we
ask two questions: first, whether Congress has 'unequivocally
expresse[d] its intent to abrogate the immunity'; and second,
whether Congress has acted 'pursuant to a valid exercise of
power.'" *Seminole Tribe*, 517 U.S. at 55 (quoting *Green v.
Mansour*, 474 U.S. 64, 68 (1985)) (alteration in original).

The Supreme Court has held that when Congress enacted the
ADA, it "invoke[d] the sweep of congressional authority,
including the power to enforce the fourteenth amendment," and
abrogated the States' immunity under the Eleventh Amendment.

7

*United States v. Georgia*, 546 U.S. 151, 154 (2006) (quoting 42
U.S.C. § 12101(b)(4)). The Court held that Congress's intent to
abrogate the States' immunity was "unequivocal" and that "insofar
as Title II creates a private cause of action for damages against
the States for conduct that actually violates the Fourteenth
Amendment, Title II validly abrogates state sovereign immunity."
*Id.* at 159.[2]

Accordingly, a plaintiff may sue a state under Title II if
the violation alleged is also a violation of the Fourteenth
Amendment. That said, there is a "growing fracture" among courts
in this Circuit as to how to determine valid abrogation of state
sovereign immunity under Title II when no Fourteenth Amendment
violation is alleged. *Dean*, 804 F.3d at 194. Before *United
States v. Georgia*, the Second Circuit applied the approach
articulated in *Garcia v. S.U.N.Y. Health Sciences Center*, which
held that "Congress had exceeded its section five authority in
enacting Title II, but that Title II suits could be limited to
circumstances in which it had not." *Bolmer v. Oliveira*, 594 F.3d
134, 146 (2d Cir. 2010) (citing *Garcia v. S.U.N.Y. Health*

---

[2] The Court applies the same abrogation analysis for the
Rehabilitation Act as it would for ADA Title II because their
standards are similar. *Dean v. Univ. at Buffalo Sch. of Med. &
Biomedical Scis.*, 804 F.3d 178, 187 (2d Cir. 2015)("As the
standards for actions under these provisions of the ADA and the
Rehabilitation Act are generally equivalent, we analyze such
claims together." (citing *Harris v. Mills*, 572 F.3d 66, 73-74 (2d
Cir. 2009)).

*Sciences Center*, 280 F.3d 98 (2d Cir. 2001)).

> Since the Equal Protection Clause only proscribes
> disparate treatment of the disabled that is not
> rationally related to a legitimate government purpose,
> Title II suits could be maintained against states only
> if the plaintiff showed that the Title II violation was
> motivated by discriminatory animus or ill will based on
> the plaintiff's disability.  And to lessen a
> plaintiff's difficulty in establishing animus relative
> to what would be demanded under traditional rational
> basis review, a plaintiff could rely on a
> burden-shifting technique similar to that adopted in
> *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05
> (1973), or a motivating-factor analysis similar to that
> set out in *Price Waterhouse v. Hopkins*, 490 U.S. 228,
> 252-58 (1989).

*Id*. at 146 (internal citations and quotation marks omitted).

Under this test, "Title II monetary claims against a state

therefore require a showing of discriminatory animus or ill will

to limit such suits to disparate treatment that violates the

Equal Protection Clause of the Fourteenth Amendment or falls

within the range of conduct Congress could otherwise prohibit

pursuant to its prophylactic authority."  *Dean*, 804 F.3d at 194.

Post-*Garcia*, *United States v. Georgia* remanded a Title II

private cause of action for the lower court to determine:

> (1) which aspects of the State's alleged conduct
> violated Title II; (2) to what extent such misconduct
> also violated the Fourteenth Amendment; and (3) insofar
> as such misconduct violated Title II but did not
> violate the Fourteenth Amendment, whether Congress's
> purported abrogation of sovereign immunity as to that
> class of conduct is nevertheless valid.

546 U.S. at 159.  *Georgia* thus "explicitly left open the question

of whether Congress may validly abrogate sovereign immunity with

respect to a particular class of misconduct that violates Title II but does not violate the Fourteenth Amendment." *Dean*, 804 F.3d at 194. This "continued uncertainty . . . has led to a divergence in the approaches adopted by district courts," with some applying *Garcia* and others questioning the validity of abrogation as suggested in *Georgia*. *Id.* at 194-95.

Under both *Garcia* and *Georgia*, "if a plaintiff cannot state a Title II claim, the court's sovereign immunity inquiry is at an end." *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 152 (2d Cir. 2013). The Court will therefore first examine the substantive merits of Rosen's ADA claims at summary judgment.

### B.  The ADA and Rehabilitation Act Claims: VTPSA

Rosen claims that his disability prevented him from participating in VTPSA, and that the DOC violated the ADA and the Rehabilitation Act by requiring programming. The DOC responds that while the ADA requires exclusion from a program or benefit, Rosen was never excluded and, in fact, ultimately participated in the program. The DOC also notes that, to the extent Rosen did not participate in VTPSA, his non-participation was the result of his own refusal rather than any disability-based discrimination.

Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be

10

subjected to discrimination by any such entity." 42 U.S.C. §
12132.  To establish a *prima facie* claim under the ADA or Section
504 of the Rehabilitation Act, a plaintiff must allege: "(1) that
he is a 'qualified individual' with a disability; (2) that the
defendants are subject to the ADA and/or Rehabilitation Act; and
(3) that the plaintiff was 'denied the opportunity to participate
in or benefit from defendants' services, programs, or activities,
or [was] otherwise discriminated against by defendants, by reason
of [his] disabilit[y].'" *Andino v. Fischer*, 698 F. Supp. 2d 362,
378 (S.D.N.Y. 2010) (citing *Henrietta D. v. Bloomberg*, 331 F.3d
261, 272 (2d Cir. 2003); *Powell v. Nat'l Bd. of Med. Exam'rs*, 364
F.3d 79, 85 (2d Cir. 2004)).  The Supreme Court has explained
that the statutory language of the ADA "unmistakably includes
State Prisons and prisoners within its coverage." *Pennsylvania
Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209 (1998).

Here, in order to be a qualified individual, Rosen needed to
meet the eligibility requirements for VTPSA.  42 U.S.C. §
12131(2) (A "qualified individual with a disability" is "an
individual with a disability who . . . meets the essential
eligibility requirements for the receipt of services or the
participation in programs or activities provided by a public
entity.").  Qualification for VTPSA participation included
submission to a psychosexual evaluation.  There is no dispute
that Rosen repeatedly refused to undergo such an evaluation.

11

When he did finally agree, he was allowed into the program. Therefore, to the extent that Rosen was ever *not* qualified, it was a result of his own refusals and not an unwillingness by the DOC.

Furthermore, it is unclear what program or benefit was being denied. Rosen was only denied access to VTPSA because he himself refused to participate. If he is instead claiming denial of parole or furlough, eligibility for release as part of those programs required a determination by the DOC he could be safely supervised in the community. *See* 28 V.S.A. § 502a, 808. Rosen had been assessed as a medium to high risk to re-offend. Because the DOC believed that he required programming prior to release on supervision, he was not eligible for such release until he completed VTPSA.

Nor is there any evidence that Rosen was denied access to VTPSA "by reason" of a disability. *Henrietta D.*, 331 F.3d at 278. The DOC required programming because of the nature of the crime and Rosen's risk assessment score. Rosen was offered an evaluation that would help determine the best programming, but refused to participate because he did not believe he was a sex offender. Rosen also believed, mistakenly, that participation in VTPSA would delay his release. Although he filed grievances relating to VTPSA, nowhere did he reference mental illness or

other disability as a reason for non-participation.[3]

Rosen's own expert, Dr. Hasazi, testified that Rosen's mental health did not prohibit him from participating in VTPSA.[4] Similarly, the DOC's evaluator concluded that Rosen's mental health condition appeared to be adequately managed, and that it should not interfere with his ability to participate in programming. Mental health was therefore not a factor in either granting or denying access to the program. Once Rosen agreed to participate in VTPSA, he found it useful and completed the program without difficulty. Given these undisputed facts, the Court finds that Rosen's ADA and Rehabilitation Act claims against the DOC with respect to VTPSA fail as a matter of law.

### C. The ADA and Rehabilitation Act Claims: Segregation

The DOC has also presented a merits argument with respect to the alleged ADA violation resulting from Rosen's time in

---

[3] Rosen argues that Offender/Inmate Orientation form prevented him from knowing that he had a qualifying disability that would warrant a reasonable accommodation. That form defined a disabled person, in part, as one who has a "physical or mental impairment that substantially limits one or more major life activities." While the parties may debate the adequacy of this definition, nothing in the form prevented Rosen from formally expressing his belief that participation in VTPSA might be harmful to his mental health.

[4] At summary judgment, Rosen has submitted a post-deposition affidavit from Dr. Hasazi stating that the 12-month program would have been harmful. The 12-month program was recommended prior to the evaluation. Post-evaluation, Rosen was assigned to the 6-month program. Dr. Hazazi's opinion is not relevant to the shorter program.

13

segregation.  The DOC first argues that Rosen did not qualify for housing in general population after receiving a DR.  As discussed above, Rosen was placed in segregation after a dispute over a coffee cup.  According to DOC regulations, an assault warrants 15 days of segregation for a conviction.  The DOC also submits that the assault raised Rosen's security level to "close custody" under the standard method of calculating security classifications.

The DOC argues that in applying these rules, no action was taken "because of" Rosen's disability.  While Rosen counters that his assault was a manifestation of his mental illness, and that segregation was therefore discriminatory, his contention raises questions about the effectiveness of his mental health treatment rather than the DOC's response to his physicality.  *See, e.g., Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1022 (9th Cir. 2010) ("The ADA prohibits discrimination because of disability, not inadequate treatment for disability."); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) ("[T]he Act would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners . . . .  The ADA does not create a remedy for medical malpractice.").  Although Rosen was given notice and an opportunity to be heard, at no time prior to this litigation did he raise his mental health as a factor in his offense.  Furthermore, the DOC reportedly took precautions to ensure that

14

Rosen's placement in segregation was medically appropriate, and Rosen acknowledged on the hearing waiver document that medical personnel had been consulted.

After Rosen was placed in administrative segregation, he was visited regularly by medical staff.  At summary judgment, he contends that he complained of harmful effects such as insomnia, paranoia, and anxiety.  It is clear from the record, however, that once Rosen formally made DOC aware that his segregation was detrimental, he was almost immediately released.  Accordingly, to the extent a reasonable accommodation was ever requested, that accommodation was provided, and no reasonable juror could hold the DOC or Commissioner Pallito liable under the ADA or the Rehabilitation Act for their actions.

D.    **ADA Retaliation Claims**

Count IX of the Fourth Amended Complaint asserts claims for ADA retaliation.  Specifically, Rosen alleges that in retaliation for grievance filings and litigation, including this case, Commissioner Pallito retaliated against him by issuing disciplinary reports and moving him from a two-person to a four-person cell.

The DOC and Commissioner Pallito first respond that where the State is immune from an ADA discrimination claim, it is similarly immune from an ADA retaliation claim.  There is district court authority for the proposition that the Eleventh

Amendment will not bar a Title V claim when it is predicated on a Title II claim. *See Maioriello v. New York State Office for People with Developmental Disabilities*, 2015 WL 5749879, at *12 (N.D.N.Y. Sept. 30, 2015) (citing *DeCotiis v. Whittemore*, 842 F. Supp. 2d 354, 370–71 (D. Me. 2012) (holding that, "[w]here the underlying claim is predicated on alleged violations of Title II of the ADA, then the Title II abrogation of immunity is extended to ADA Title V retaliation claims."). Furthermore, the Court has not determined whether Title II abrogates Vermont's sovereign immunity with respect to this case. Consequently, the Court will again proceed to the merits of the claim.

Title V of the ADA "prohibits, inter alia, retaliation against any individual who has asserted rights under the ADA." *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999). A plaintiff states a retaliation claim under the ADA or the Rehabilitation Act by establishing that "(i) plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Weixel v. Bd. of Educ.*, 287 F.3d 138, 148 (2d Cir. 2002) (internal quotation marks omitted). "Courts properly approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse

action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quotation marks and citation omitted).

The fundamental flaw in Rosen's retaliation claim is that although he was engaged in protected activities, such as filing grievances and lawsuits, those activities were not plainly related to claims of discrimination. As the DOC notes in its briefing, Rosen filed a petition in state court based upon the assertion that he was not a sex offender. Nothing in that petition would have alerted either the state court or the defendants that he was concerned about discrimination on the basis of his disability. Rosen's grievances were similarly opaque as to any possible discrimination claim. The focus of those grievances was that he should not be required to participate in VTPSA, *not* that forced participation was in some way discriminatory under the ADA.

The instant lawsuit is the exception, as Rosen clearly asserts claims under the ADA. Rosen alleges that after he filed suit, he was transferred from a two-bed cell to a four-bed cell. It has been held, however that a mere transfer without a corresponding deprivation of privileges does not rise to the level of retaliatory action. *See Warren v. Goord*, 2006 WL

1582385, at *13, *21 (W.D.N.Y. May 26, 2006), *aff'd*, 2008 WL
5077004 (2d Cir. Nov. 26, 2008) (transfer to a four-bed cell was
not sufficiently adverse to support a claim of First Amendment or
ADA retaliation).  Rosen also claims that he received a DR for
misusing medication, for which he received a loss of recreation
time for four days.  Again, this sort of minor deprivation would
not "deter a prisoner of ordinary firmness from vindicating his
or her constitutional rights through the grievance process and
the courts."  *Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir.
2004).  Rosen has also failed to show any causal connection
between the DR and this case, as he received the discipline
several months after amending his Complaint to add ADA claims.
*See Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85-86 (2d
Cir. 1990) (three and a half months insufficient for causal
connection in retaliation claim); *Meggison v. Paychex, Inc.,* 679
F. Supp. 2d 379, 388 (W.D.N.Y. 2010) (period of four months
insufficient).  His retaliation claims therefore fail as a matter
of law.

  **E. Eighth Amendment Claims**

  Rosen alleges that his placement in disciplinary segregation
violated his rights under the Eighth Amendment.  This Court
previously ruled that Section 1983 claims for damages against
Commissioner Pallito in his official capacity are barred by
sovereign immunity, while individual capacity claims for damages

18

are barred for lack of personal involvement.  Claims against the Department of Corrections are also barred by the State's immunity from suit in federal court under the Eleventh Amendment.  What remains, therefore, is Rosen's claim against the Commissioner for prospective injunctive relief.

The DOC argues that Rosen's injunctive relief claims are moot because he has been released from prison.  Rosen responds that his claims are "capable of repetition yet evading review." *Murphy v. Hunt*, 455 U.S. 478, 482 (1982).  "In order for a federal court to retain jurisdiction over a case, an actual controversy must 'exist at all stages of review, not merely at the time the complaint is filed.'"  *Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996) (quoting *Preiser v. Newkirk*, 422 U.S. 395, 402 (1975)).  "A case is moot when 'it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, [and] interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'"  *Davis v. New York*, 316 F.3d 93, 99 (2d Cir. 2002) (citation omitted).

"Where a prisoner has been *released* from prison, his claims for injunctive relief based on the conditions of his incarceration must be dismissed as moot."  *Pugh v. Goord*, 571 F. Supp. 2d 477, 489 (S.D.N.Y. 2008) (emphasis in original); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992)

("Past exposure to illegal conduct does not in itself show a
present case or controversy regarding injunctive relief . . . if
unaccompanied by any continuing, present adverse effects.")
(internal quotations omitted). Although an exception applies
where the offense is "capable of repetition yet evading review,"
that exception does not apply in this case, as there is no reason
to believe (1) that Rosen will be re-imprisoned, and (2) that he
will be subjected to the same unconstitutional conditions alleged
in his pleadings. *See Phillips v. Ienuso*, 1995 WL 239062, at *2
(S.D.N.Y. Apr. 24, 1995) (mootness exception does not apply to
claims brought by parolee). Rosen's programming is complete, and
in order for him to be placed in segregation, he would have to
violate prison rules. *See United States v. Corbin*, 620 F. Supp.
2d 400, 407 (E.D.N.Y. 2009) (citing *Reimers v. Oregon*, 863 F.2d
630, 632 (9th Cir. 1989) (mootness exception does not apply where
conduct would recur only if appellant were to commit another
crime and return to prison)). His claims for injunctive relief
on the basis of Eighth Amendment violations are therefore
dismissed.

### F. Due Process Claims

Rosen submits that because he was designated as SFI, DOC
policies allegedly required additional due process protections.
Those protections included a limit of 14 days in segregation.
Rosen submits that he received 15-day segregation sentence, and

that he spent an additional 22 days in the same segregation cell for administrative segregation. DOC regulations also called for a medical screening by a qualified mental health professional. That screening required: (1) an opinion as to whether the behavior resulting in discipline was the product of the SFI, (2) whether segregation was contraindicated, and (3) a recommendation for disposition or sanction alternatives. An inmate could not be placed in segregation unless a physician confirmed the lack of contraindications.

While the parties may disagree as to whether DOC-mandated procedures were fully satisfied, the DOC cites the well-established proposition that "regardless of state procedural guarantees, the only process due an inmate is that minimal process guaranteed by the Constitution." *Shakur v. Selsky*, 391 F.3d 106, 119 (2d Cir. 2004). "[T]o the extent internal prison regulations grant protections beyond the constitutional minimum, noncompliance with those regulations do not typically offend due process." *Agosto v. Hufford*, 2014 WL 2217908, at *3 (S.D.N.Y. May 8, 2014), *report and recommendation adopted*, 2014 WL 2217925 (S.D.N.Y. May 29, 2014) (citations omitted); *see also Blouin v. Spitzer*, 356 F.3d 348, 363 (2d Cir. 2004) ("federal law, not state regulations, determines the procedures necessary to protect [a due process] liberty interest."). Under federal law, to establish a violation of due process rights a plaintiff must show

"(1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001). "A prisoner's liberty interest is implicated by prison discipline, such as [segregation], only if the discipline imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (internal quotation omitted). Factors relevant to determining whether the plaintiff endured an "atypical and significant hardship" include "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions" and "the duration of the disciplinary segregation imposed compared to discretionary confinement." *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir. 1998).

In assessing duration of confinement, "restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection, and thus require proof of conditions more onerous than usual." *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009); *see also Sandin v. Conner*, 515 U.S. 472, 486 (1995) (holding that 30 days in segregation did not create a liberty interest, as "discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create

a liberty interest"). Here, Rosen was confined in segregation for approximately 40 days, and has offered little evidence to suggest that the conditions of his segregation were more onerous than usual. His argument is that, for him, the conditions were unconstitutional because of his mental illness. In terms of due process, however, the Court finds no violation of either a liberty interest or his procedural rights. Briefly stated, Rosen waived his right to a hearing, his conditions of confinement were not atypical, and his physical health was monitored closely throughout his time in segregation. When he filed a written request for release, he was released. Given this set of facts, no reasonable juror could find that the DOC and Commissioner Pallito had violated Rosen's right to due process.

## III. Correct Care Solutions' Motion for Summary Judgment

### A. Mental Health Care

Rosen's claims against CCS focus on two primary issues: the quality of his mental health care and the treatment of a 2012 foot injury. As noted above, when Rosen was incarcerated in 2011 he was designated as having a "serious functional impairment," or SFI. His mental health was monitored by psychiatric nurse practitioner Kathryn Mathieson and other mental health clinicians. Between June 2011 and December 2014, he was seen by NP Mathieson approximately thirty-five times. Nonetheless, Rosen claims that NP Mathieson did not see him often enough. He also

claims that the psychotherapy he received from other providers was not appropriate and not frequent enough.  Finally, Rosen claims that CCS failed to adequately screen him prior to his placement in segregation, and failed to provide proper mental health care while he was in segregation.

Prior to his segregation, Rosen was offered a hearing, waived the hearing, and the DOC produced a hearing form.  Among other things, the hearing form indicated that the DOC had "consulted medical" prior to placing Rosen in segregation.  A CCS nurse also completed a pre-segregation health evaluation.  During the application of a screening tool completed by a CCS mental health professional, Rosen expressed no concerns regarding his placement in segregation.

Rosen has only a limited memory of his time in segregation and restrictive housing.  Although he testified that he does not remember specifically meeting with anyone while he was in segregation, his records indicate that he was seen numerous times by mental health professionals, including three visits with his psychiatric provider.

Rosen submitted a sick slip at the outset claiming that he was "hearing voices," but now says he has no memory of that time.  NP Mathieson testified that she saw no indication that he was responding to internal stimuli, which was usually the case with patients who were hallucinating.  She also noted that his reports

of hallucinations "seemed to come and go so quickly, and it wasn't a typical presentation."

A February 22, 2012 note from NP Mathieson indicates that although Rosen was experiencing sleep issues and was mildly agitated, he told her that he "like[d] it in seg better than I like it out there."  Rosen also reported that his medication was working well, and that he had been writing chapters of a book and "reading like crazy."  NP Mathieson acknowledged that placement in segregation was a dramatic transition for him, that he was experiencing mood swings, and that he appeared anxious and agitated.

By early March, segregation began having increasingly negative impacts.  NP Mathieson's notes from March 7, 2012 commented that Rosen had been picking his skin due to anxiety and boredom, that he felt more stable in the general population, and that she would discuss terminating segregation as soon possible if it was proving detrimental to Rosen's health.  She saw Rosen again on March 14, at which time he reported ongoing sleep issues but less anxiety.  He was transferred out of segregation on March 16, 2012.

## B. Foot Injury

Rosen's foot injury occurred on October 20, 2012, when he landed on the foot of another inmate while playing basketball. He was seen by a nurse, who recommended icing, rest, and

25

elevation for two days.  He was seen again by nursing on October 22, at which time he reported that his foot was still swollen and painful.  When Rosen filed a grievance stating that he was "hopping around like a rabbit," he was provided crutches.

Rosen was seen by a doctor on October 24, 2012, and was referred for x-rays.  A radiology report from an October 25, 2012 x-ray indicated a "subtle nondisplaced impaction fracture" with "associated soft tissue swelling."  Rosen was then provided what CCS describes as a cast boot, but that Rosen contends was actually a flat piece of plastic that looked like a sandal. Post-injury, Rosen reported brief periods of "random, sharp pain," but resumed playing basketball and handball.

In March 2104, at Rosen's request, a CCS physician referred him for a follow-up x-ray.  The x-ray showed no evidence of acute fracture, but noted mild osteoarthritis and changes in the metatarsal that were presumed to be post-traumatic.  In early 2015, Rosen was referred to Dr. Glen Neale, an outside orthopedist.  Dr. Neale noted increased sclerosis and cystic areas, and suggested surgery to fuse the joint.  Dr. Neale also noted that Rosen may have had a similar injury involving the second metatarsal when he was a child.

In May 2015, Rosen was seen by a second orthopedic surgeon, Dr. Mark Charlson.  Dr. Charlson recommended against fusion of the joint, but discussed with Rosen the possibility of surgery to

reduce bone spurs and shorten the metatarsal.  He also discussed
a more conservative approach, which involved placing a pad in
Rosen's shoe to take weight off the joint.  CCS was no longer the
provider at that time, and the new provider, Centurion, opted for
the metatarsal pad.  Rosen underwent surgery after his release
from prison.

### C.  Evidence of the Standard of Care

In its motion for summary judgment, CCS argues that Rosen
cannot sustain his claim because his experts have not offered
opinions as to the relevant standards of care.  Under Vermont
law, the standard of care is that of a "reasonably skillful,
careful and prudent health care professional engaged in a similar
practice under the same or similar circumstances whether or not
within the state of Vermont."  12 V.S.A. § 1908(1).

CCS first submits that Dr. Hasazi failed to testify to a
breach of the standard of care because he did not know the
applicable standard for mental health services in prison.
Indeed, Dr. Hasazi conceded in his deposition that he did not
know if the standard of care in a prison is the same as the
standard of care in the broader community.  Dr. Hasazi did
testify that, in his opinion, if Rosen had *not* been incarcerated,
the treatment he received would not have met the prevailing
standard.

According to DOC policy, "[t]he Vermont Department of

Corrections requires its contracted medical service providers and its medical services employees to provide to inmates the same professional minimum standards of care that would be found to be provided to any citizen of the community at large."  Similarly, Vermont law requires the DOC to "provide health care for inmates in accordance with the prevailing medical standards."  28 V.S.A. § 801(a).  Dr. Hasazi's testimony about Rosen's care under the prevailing, community standard was therefore sufficient.

CCS makes essentially the same argument with respect to Rosen's orthopedic expert, and surgeon, Dr. Charlson.  Dr. Charlson expressed concern about the quality of Rosen's care in several respects, including: the length of time between the foot injury and the evaluation by Dr. Neale; the delay in follow-up after sending Rosen to a specialist; and the unwillingness to provide surgery when it was medically indicated.  This testimony, like that of Dr. Hasazi, was sufficient for Rosen's medical malpractice claim to proceed.

### D.   Exhaustion of Administrative Remedies

CCS's second argument, regarding Rosen's failure to exhaust his administrative remedies, presents a far greater impediment. Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility

until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA's exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.'" *Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004) (quoting *Porter v. Nussle*, 534 U.S. 516, 532, (2002)). Here, CCS contends that because Rosen did not exhaust the prison grievance process for each of his current claims, his suit is barred.

The DOC's grievance process is initiated by filing a grievance form. The deadline for filing is ten days from either the event being grieved or the discovery of the cause for the grievance. DOC staff, or as in this case, a DOC contractor's staff must attempt to resolve the grievance within 48 hours. If the issue is not resolved, the inmate may file a formal grievance within 14 days of the failure of the resolution process. Each formal grievance is then investigated, and a recommendation is made to the facility superintendent. The superintendent must determine if the grievance is sustained, sustained in part, or denied. After that determination is made, the inmate may appeal to the appropriate DOC executive, and then to the DOC Commissioner. A request to the Commissioner is the final step in the process.

It is undisputed that Rosen filed over 140 grievances while

incarcerated.  Three of those grievances pertained to CCS.  The first, filed on October 21, 2012, claimed that he had suffered a schizophrenic episode and asked if he could speak with a health care professional.  A nurse responded the next day, October 22, and NP Mathieson met with him on October 23.  It was during this visit that Mathieson saw no indications that Rosen was responding to internal stimuli.  Although Rosen did not agree to the proposed resolution, he did not proceed any further in the grievance process.

The other two grievances related to Rosen's foot injury.  The first requested crutches, and crutches were provided.  Rosen concedes that this grievance was resolved to his satisfaction.  In the second, filed in August 2013, Rosen asked to be seen by a doctor because "my throat is leaking puss and blackness and is in so much pain[,] my foot is broke and my back hurts like hell."  The response indicated that Rosen was seen by a nurse the same day to check on his throat, and that he had a physical scheduled in the near future to discuss his other symptoms.  Rosen again indicated that he was not satisfied, but did not appeal.

Rosen argues that dismissal for lack of exhaustion is not warranted because the grievance process was somehow unavailable.  His first argument is that the process was too "opaque" to be used.  This claim is belied by the fact that Rosen commenced over 100 grievances, and completed the entire process by appealing to

the Commissioner on at least one occasion.  Rosen also admitted in his deposition that he understood the process.

Rosen next submits that the grievance process was futile because his mental health and medical care had no potential to improve.  This argument pertains not to an unavailable process, but rather to the quality of care.  Such a substantive concern is not relevant to the question of whether the grievance process itself was adequate.  The Court therefore finds that the process was fully available, and that Rosen failed to exhaust his administrative remedies as required by the PLRA.

The remaining question with respect to exhaustion is whether dismissal should be with prejudice, thus forever barring Rosen's claim, or without prejudice such that he can exhaust his administrative remedies and bring suit again the future. "Ordinarily, the proper remedy where a prisoner has failed to satisfy the exhaustion requirement is to dismiss the complaint without prejudice, to give the inmate a chance to exhaust his administrative remedies and then refile his complaint." *Brown v. Napoli*, 687 F. Supp. 2d 295, 298 (W.D.N.Y. 2009); *see also Morales v. Mackalm*, 278 F.3d 126, 128 (2d Cir. 2002) (dismissal for failure to exhaust should be without prejudice to refiling following exhaustion).  Rosen attests that while under community supervision he still has administrative remedies available to him.  His claims against CCS are therefore dismissed without

prejudice.

## IV.  Centurion's Motion for Summary Judgment

Centurion succeeded CCS as the entity contracting with DOC for the provision of medical and mental health services. Centurion's contract commenced on February 1, 2015.  Rosen was released from custody approximately 11 months later.

First, Centurion argues that the ADA and Rehabilitation Act claims cannot be brought against it as a private contractor that does not receive federal funding, and Rosen has conceded those claims.  The ADA and Rehabilitation Act claims against Centurion, including any claims of ADA retaliation, are therefore dismissed.

As to medical malpractice, Centurion submits that Rosen was seen regularly by mental health providers from February 3, 2015 through December 24, 2015.  In his deposition, Dr. Hasazi did not recall reviewing mental health records generated prior to June 4, 2014, and he expressed no opinion about Rosen's mental health care since that time.  Again, Centurion did not provide mental health services prior to February 1, 2015.

Vermont law generally requires a plaintiff to use an expert witness to satisfy his burden of proving the elements of medical negligence.  *Taylor v. Fletcher Allen Health Care*, 192 Vt. 418, 422 (2012).  An exception applies 'where the violation of the standard of medical care is so apparent to be comprehensible to the lay trier of fact."  *Senesac v. Assocs. in Obstetrics &*

*Gynecology*, 141 Vt. 310, 313 (1982) (quotation omitted).  That

exception does not apply here, and Rosen's mental health expert

has not established a breach of the duty of care by Centurion

with respect to mental health treatment.  Those negligence claims

are therefore dismissed.[5]

Rosen's claims of Eighth Amendment violations against

Centurion are also insufficient.  "[N]ot every lapse in medical

care is a constitutional wrong."  *Salahuddin v. Goord*, 467 F.3d

263, 279 (2d Cir. 2006).  To allege an Eighth Amendment

violation, an inmate must satisfy objective and subjective

elements of a two-pronged test: "(1) objectively, the deprivation

the inmate suffered was 'sufficiently serious that [she] was

denied the minimal civilized measure of life's necessities,' and

(2) subjectively, the defendant official acted with 'a

sufficiently culpable state of mind ... such as deliberate

indifference to inmate health or safety.'"  *Walker v. Schult*, 717

F.3d 119, 125 (2d Cir. 2013) (quoting *Gaston v. Coughlin*, 249

F.3d 156, 164 (2d Cir. 2001)).  Regarding the objective

requirement, "the inmate must show that the conditions, either

alone or in combination, pose an unreasonable risk of serious

---

[5]  Moreover, Rosen appears to base his malpractice claim on "the continuing failure to reach a diagnosis."  ECF No. 185 at 6. The record makes clear that numerous mental health professionals, over a period of many years, had difficulty identifying a precise diagnosis for Rosen.  Accordingly, no reasonable juror could conclude, based upon this sole fact, that Centurion is liable for medical malpractice.

33

damage to [her] health." *Walker*, 717 F.3d at 125 (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)); *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002)).  Plaintiff thus must allege prison officials deprived him "of [his] 'basic human needs' such as food, clothing, medical care, and safe and sanitary living conditions." *Id.* (quoting *Rhodes*, 452 U.S. at 347).

    Here, the allegations with respect to Centurion's conduct fall well short of deliberate indifference.  Centurion began providing services to DOC inmates in February 2015, which was the same month that Rosen consulted with Dr. Neale.  As discussed above, Dr. Neale perceived that there might be a fracture and recommended an evaluation to explore the possibility of fusion surgery.  Dr. Charlson believes that, under the prevailing standard of care, there should have been a follow-up appointment within one month of that recommendation.  Instead, Rosen was not seen by a physician for follow-up until over two months after his appointment with Dr. Neale.  While this delay may have been substandard, no reasonable juror could find that it rose to the level of an Eighth Amendment violation.

    Dr. Charlson also opined that, had Rosen been in the community, he would have been able to choose surgery himself rather than seek approval from Centurion.  The Court questions whether this fact even evidences negligence, as Centurion opted for a more conservative approach that had been suggested by Dr.

Charlson himself.  In any event, Rosen's lack of choice due to his incarceration did not result in an Eighth Amendment violation.

Dr. Charlson's third concern regarding Rosen's medical care relates to the timing of his treatment.  Although Centurion was not responsible for any initial delay, Dr. Charlson is critical of the fact that Rosen did not see a physician to evaluate his ankle between 2012 and 2015.  He is also critical, as noted, of the delayed follow-up.  Finally, Dr. Charlson testified that he would not have waited from May 5, 2015 to August 24, 2015 to review whether the metatarsal pad treatment was effective. Again, while this delay might not have met the standard of care, it did not demonstrate the sort of deliberate indifference to a serious medical need that rises to the level of an Eighth Amendment violation.  The Eighth Amendment claim against Centurion is therefore dismissed.

Before addressing the question of negligent care with regard to Rosen's foot injury, the Court turns to the issue of administrative exhaustion.  Like CCS, Centurion argues that Rosen's claims must be dismissed because he failed to exhaust his administrative remedies.  Rosen responds that he did, in fact, exhaust all procedures available to him with respect to his request for foot surgery.

According to Rosen, when he filed a grievance relating to

his foot, DOC staff responded by directing him to file a health service request. This sort of administrative dismissal of a grievance cannot be appealed, and is instead reviewed by the Department Hearings Administrator. Rosen contends that the only instruction to an inmate in the event of an administrative dismissal is that he rewrite and resubmit the grievance if he chooses. With respect to health service requests, Rosen contends that he filed 12 such requests regarding his foot care while Centurion was the DOC contractor, specifically requesting surgery on seven occasions. Two of those requests were filed after the administrative dismissal of his formal grievance. Accepting these facts for the purposes of summary judgment, the Court cannot conclude that Rosen failed to exhaust his administrative remedies.

Medical malpractice is a state law claim over which this Court has no original jurisdiction. By virtue of this Opinion and Order and the Court's prior rulings, all federal claims have been dismissed. By statute, a federal court may decline to exercise supplemental jurisdiction over state law claims if the court "has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3). As the Second Circuit has explained, "if [the plaintiff] has no valid claim under § 1983 against any defendant, it is within the district court's discretion to decline to exercise supplemental jurisdiction over

36

the pendent state-law claims." *Matican v. City of New York*, 524 F.3d 151, 154-55 (2d Cir. 2008); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.").

Here, the Court will adhere to the usual rule and refrain from exercising supplemental jurisdiction over Rosen's state law medical negligence claim against Centurion with regard to his foot injury. That claim is therefore dismissed without prejudice.

## Conclusion

For the reasons set forth above, the motion for summary judgment filed by Commissioner Pallito and the DOC is **granted**, and the claims against those defendants are dismissed. CCS's motion for summary judgment is **granted** based upon Rosen's failure to exhaust his administrative remedies, and the claims against CCS are **dismissed without prejudice.** Centurion's motion for summary judgment is granted as to all claims except the state law medical malpractice claim regarding Rosen's foot injury, which is **dismissed without prejudice** for lack of jurisdiction.

This case is closed.

DATED at Burlington, in the District of Vermont, this 19th

day of December, 2017.

                                    /s/ William K. Sessions III
                                    William K. Sessions III
                                    District Court Judge